19-2487 from the District of Minnesota, United States v. Cleophus Reed, Jr. Mr. Langeling, can you hear me? Yes, I can. Very good. And Ms. Busicki, can you hear me? Yes, I can. We do not have video. Can you turn your camera on? I have turned the camera on. If you'd like, I can exit and rejoin the session. That would be great. Thank you. Okay, I will do so right now. Okay.  . . . Judge Kelly? Yes? Do we want to just take our break after two cases rather than after three in light of the technical difficulties? That's an excellent idea, Judge Erickson. Why don't we go into recess for . . . Oh, she's right here. Oh, okay. All right. Great idea, though. All right. Let's . . . Just a few seconds too late. All right. Do we have everyone, then? Ms. Busicki? Can you confirm that the court can hear and see me? Yes, we can. Thank you. Thank you, Your Honor. All right. I think we . . . Oh, you may go ahead and call the next case, then. 19-2487 from the District of Minnesota, United States v. Cleopas Reed, Jr. All right. We're prepared to hear argument from counsel. You may begin. Thank you. May it please the court and counsel, thank you for hearing me today, everybody. Let me start by saying that this case presented some significant challenges to me or for me as Mr. Reed's attorney. I was substitute counsel here. Mr. Reed came into this case with a deep suspicion about the fairness of the process in general and probably a deeper suspicion of me as his attorney. And so while we were able to work well together, this case got a little tricky. And if you looked at the transcript, you can see that his testimony was not helpful to him in this case. I wanted Mr. Reed to feel that he was heard. I wanted him to get a fair trial. And now, today, of course, I want to make sure that his issues are properly raised for him. He raises three main challenges in this case. The sufficiency of the evidence to prove that he or to convict him of the counts he's convicted on. He wanted a motion for a new trial that he felt was not handled properly by the district court. And then also the appropriateness of the sentence, which may, in fact, be the more interesting argument of the three here today. With regard to the sufficiency of the evidence, Mr. Reed maintains that the government didn't actually establish that his role in the conspiracy was ever knowing or that he actually even joined a conspiracy. Because he bases that mostly on the fact that we had cooperating witnesses that, in his view, were not credible. Mr. Jovan Gentle was the main target of this initial investigation in this case. He ended up becoming the government's sort of main cooperating witness in more than one case. I mean, several cases at once. This individual was appearing in court on a weekly basis in several cases, which was known to everybody. Because, meanwhile, Mr. Gentle, as a cooperating witness, was housed in the same county jail with other witnesses. Mr. Dulaney, who was a co-defendant but also a cooperator, and an individual by the last name of Matt, who was not a part of this conspiracy case but was housed at the same county jail and ended up coming in as sort of a jailhouse informant sort of witness for the government. They were all in there at the same time. Mr. Reed found that to be highly suspicious because really the only thing that tied him to this case was these witnesses here. Meanwhile, he had no monetary gain from the case. There's no direct evidence that Mr. Reed had ever had any money or drugs on him whenever he had contact with the police. In fact, it looked as if he may have been living out of his van at one time. He knew the main perpetrator of this conspiracy, Mr. Klein, from a janitor job that he had had. While there's not a whole lot to get into here for purposes of oral argument now, I think I've put it all into the brief. His position is that there just wasn't enough evidence here, mostly because of the credibility of the witnesses. Isn't that a question really, though, for the jury or for the fact finder as to whether they're credible or not? It really is, Your Honor. I mean, to be honest, I'm not going to come in here and say there's some kind of case that says that you should second-guess that because there isn't. I've explained this to Mr. Reed that that's a very difficult thing for an appellate court to be able to review. They're not there for the trial. You've got a transcript. I think what he is mostly concerned about here is sort of going on to the next issue, which was the motion for a new trial. He was unhappy with the way some of the evidence came in with regard to, say, the handwritten note that was involved here. Mr. Mack's testimony in general, he felt that what it was was a character attack, which, you know, I mean, that's how all defendants probably feel at some point when you're on trial, that they're coming at your character. But in his position, it was too much. And he felt that, quite frankly, he was at a disadvantage here. I know that my brief had a lot of argument about the racial component of the jury and why Mr. Reed felt that that was unfair. But it really did sort of, as I said in my brief, it kind of confirmed his greatest fears when he came in the courtroom, and he didn't really see anybody that looked like him. Does the record show what the racial composition of the veneer or the actual jury panel that served on his case was? I believe it does. I made an objection during the voir dire process. And I think Judge Brassel made a statement on the record about the fact that it does not appear as if there is any people of African-American background on the jury panel. But, of course, we weren't questioning directly on that issue. It's just that that was the appearance. Is that is that a I'm guessing you try a few cases there and maybe you're in communication with other lawyers. Is that common to have so few or no minorities on the panel district? It is, unfortunately. And that's why I wrote the brief in the way I did, talking about how it's maybe more likely to have more African-American people on the jury if you are trying a case in Minneapolis because there's different divisions. Although there's some argument as to whether that's true or not. I don't know that we can guarantee that at all. But, yeah, it's a common occurrence, although I will say I just had a jury trial there in St. Paul this year that didn't go that way. So, I mean, we we had a more diverse crew. But because we're short on time, if you don't mind, your honor, I'd like to move to this issue three with regard to the sentence here. Mr. Reid has raised an argument about the sentence in the sense that he was very much concerned about why the conversion, the drug conversion tables treated the crack cocaine differently than would say powder cocaine or any other kind of drug. It seems to be on a different track and it's almost like a sort of holdover or a relic of the pre Kimbrough and Spears line of cases where it's cracked on is converted to three thousand five hundred seventy one grams on the conversion date. And it ended up putting his guideline range, I thought, significantly higher. I had calculated in going through the guidelines that when, you know, not accounting for the conversion table, his guideline range would have been much lower. He would have come in. In my opinion, I think the criminal history category was still a category five, but he would have come in more like a level 32, whereas the PSI had him at level 36 in category five. Judge Russell was kind enough to grant one of his objections with regard to maintaining a stash house. There was no evidence to show that my client was actually maintaining that residence. So that enhancement didn't apply. And we are grateful for that. But it wasn't significant enough to change it in the way that I thought that the drug conversion table should. Now, my understanding of the of the record on this is that you presented you presented this argument. The district court considered it and simply rejected it. Right. I mean, the district court could have gone down in light of that argument that maybe it was too heavy in light of crack cocaine and just just decided not to. Is there an argument here that the district court didn't do enough in terms of considering it? Or is it just I disagree with what the district court did? Well, it's really both runner. I mean, I felt like the district court disregarded it, but didn't give us any real base or just simply kind of jumped over it and said, why just overrule your objections to it? And I thought that it was insufficient. Isn't it isn't it true that we've said that the judge is under no obligation to question the underlying science or the underlying validity of the sentencing guidelines or the basis for the guidelines? I should say it's also true that that the sentencing commission has gone before the Congress a couple of times about the crack to powder ratio. And Congress has elected to continue the the ratio. And the ratio is at this point really being driven by the statute as much as anything and by the Congress's approach to the guidelines, not the statute, but their rejection of the amendments. And then you end up in a situation where, you know, the judge has to make a call. Am I going to vary because I think Congress has got it wrong or am I going to defer to the guidelines which reflect the judgment of the Congress? Right. And isn't she free to do that? Well, certainly we were analyzing this under whether or not there was a policy disagreement with the guidelines as to how they're applied with this conversion table. And it was our position that based on the way the cases had come out with regard to the guidelines on crack versus powder cocaine, this seemed to be sort of right in line with other policy disagreements that the courts had had prior to that, but now in the context of the conversion table. So while she may not be required, Your Honor, to do that, it certainly appeared to me that this absolutely was really kind of the same argument, only in a different context with regard to the difference between crack and powder cocaine. So my client, of course, was just disappointed that there wasn't an explanation for that. It was just a simple denial. And I think in his position, it's not enough. I mean, if we were to ask for a court to issue a sentence that's sufficient but not too much, we should have an explanation. But my time just ran out. So thank you very much. I appreciate it, Your Honor. Thank you. Thank you for your argument. We appreciate it. Counsel for the government. May it please the court. My name is Kate Vizicky. I'm with the United States Attorney's Office for the District of Minnesota. I'd like to begin by addressing prongs two and three of the Duren test related to the defendant's challenge of his trial and the composition of the jury. In prong two and prong three, we have the heart of the Duren test. The government agrees that the African-American community does present a distinctive group, and that prong, prong one, is met. Prong two, however, requires that the defendant present some evidence to the court that that distinctive group has a representation on the veneers from which juries are selected that is not fair or reasonable in relation to the percentage of that distinctive group in the community. And here, the defendant did not present evidence to meet his burden under prong two. Now, I will note that when the defendant raised his initial challenge, first at the voir dire and then it was later discussed on the first day of trial, the court was very solicitous and invited the defendant to raise the issue later. Although she provisionally, although the court provisionally denied the motion, the defendant had every opportunity to gather information to meet the burden in prong two. And in the defendant's filings, he presented only information from the census and not information that would be helpful to the court in relating that data to either the veneer panel in his case or the master list for the District of Minnesota. Now, the next prong, prong three, talks about the systemic or purposeful underrepresentation of the distinctive group. And again, here, there is no evidence in the record to support the idea that the District of Minnesota systematically takes efforts to underrepresent a distinctive group like African Americans from its juries. In your experience, do you agree that this is a common problem? That the jury panels that come into the District of Minnesota lack minority representation? Your Honor, I do not agree. I've been with the District of Minnesota for about seven years. I don't represent that my experience is comprehensive of all AUSAs. But the trials that I've had have had a diversity of representation of race, ethnicity, and other protected classes. So I don't have any data of the kind that would satisfy an inquiry under Duren. But because the court asked about my own experience, I would disagree based on my own experience. In the Duren test, prong three, the Supreme Court showed how a defendant can meet his burden to demonstrate the systemic exclusion of a distinctive group, in that case, women. Here, the defendant did not present any evidence to demonstrate that the District of Minnesota is excluding any distinctive group. And as the government demonstrated in its brief, the District's plan envisions that voter registration lists may not be sufficient to get the fair cross-section of individuals who could be potential jurors on a trial. And therefore, the District's plan for selection of jurors includes other types of lists, including state ID card lists and driver's license lists that may sweep up more individuals than voter registration lists. And that's notable because this court's own precedent in Sanchez and other cases going back as far as the early 1990s shows that voter registration lists are sufficient. Further, in this case, the defendant didn't make any efforts to connect his own experience and observations to a larger pattern within the district. I have a question about just how this works when you say that it sounds like you say you start with the voter registration lists and then maybe go and then go to the I'll call it the motor ID group to sweep in others. How does that work? Sometimes it's called supplementing the voter list with that. Or is it that you just go to all three of those simultaneously? When I say three, I say voter, motor and ID. Are they all drawn from equally? Do you know how that works? Your Honor, that evidence is not in the record today, so I can't come before the court and represent how the clerk's office uses the various lists and how, more importantly, its software is designed. So I wouldn't want to provide information at the court that's not accurate. But that doesn't mean it didn't get this far in this particular motion. That's correct, Your Honor. As I mentioned, the district court invited the defendant to raise his motion again. And that could have been accomplished through the means of Rule 17 subpoenas or other tools available to him following his trial because the district court demonstrated that it was open if evidence was available to show that he could meet the Durand test to considering the motion again. I'd like to just return to my previous point that the defendant's motion was, because of the way it's presented, based entirely on his own subjective experience and observations during his trial. And this court's precedent in Greywalker and other cases has stated that a single panel, one single trial, in other words, is not enough evidence to demonstrate the systemic exclusion that Durand is attempting to prevent. So, Your Honor, with respect to the defendant's right to a fair trial, the right for all defendants to have a jury that reflects the broad population of the state and district in which they're tried is important. It's essential. But in this case, the evidence simply isn't there to demonstrate that there is any violation of the Defendant's Sixth Amendment right in this case or more broadly in the District of Minnesota. With respect to the sufficiency of the evidence, I'll just mention briefly some of the defendant's main arguments before I conclude. What the defendant is really arguing is that the testimony of the cooperating witnesses is insufficient and he wants the court to consider their testimony invalid. But this court has held in King that a jury can convict solely on the testimony of cooperating witnesses. And as the court can see in the record here, this trial was about far more than the testimony of cooperating witnesses. There was DNA evidence. There were distinctive items that were seized at both the Colfax Avenue residence and the Emerson residence. There were weapons. There was drug distribution equipment and a variety of other things that corroborated the testimony of the cooperating witnesses. And further, as this court held in Tillman, a jury is qualified and competent to evaluate the testimony and the credibility of any cooperating witness, especially when it has a full explanation about the agreement that they have with the government. So unless there are any further questions from the court, I will conclude my remarks. And we respectfully ask this court to uphold the verdict in this case in all respects. Thank you, Your Honors. Thank you. Do you have some rebuttal time left over? I think I used all of my time, Your Honor. Would you like a minute? It's okay. I think we've covered it here. I mean, certainly we can rest on the record as it is. All right. Well, we thank both counsel for your arguments here today. We appreciate the arguments on behalf of your clients, and we will take the matter under advisement.  Yes, Your Honor.